MONSANTO COMPANY, Petitioner-Appellant, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

Fifth District    No. 75-236

Opinion filed June 3, 1976.—Rehearing denied July 8, 1976.

G. J. MORAN, J., dissenting.

Richard J. Kissel and Thomas H. Donohoe, both of Martin, Craig, Chester & Sonnenschein, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield (Larry R. Eaton and Barry Forman, Assistant Attorneys General, of counsel), for appellees.

Mr. JUSTICE JONES delivered the opinion of the court:

This case comes before us as a direct appeal of a decision of the Pollution Control Board, pursuant to section 41 of Illinois Environmental Protection Act (Ill. Rev. Stat., ch. 111½, par. 1041), Supreme Court Rule 335 (Ill. Rev. Stat., ch. 110A, par. 335), and the Administrative Review Act (Ill. Rev. Stat., ch. 110, par. 264 *et seq.*). The Monsanto Company, petitioner-appellant (hereinafter "Monsanto"), filed an amended petition with the Pollution Control Board (hereinafter "Board") seeking a permanent variance from the provisions of Illinois Water Pollution Regulation 702(a), which pertains to mercury discharges to public sewer systems. That regulation provides, "No effluent to any public sewer system shall include mercury or any of its compounds in excess of 0.0005 mg/1 as Hg [0.5 parts of mercury per billion parts of water] at any time."

On April 24, 1975, the Board entered its opinion and order granting Monsanto a variance from November 6, 1974, to November 5, 1975. The Board imposed as conditions of the variance the requirements that Monsanto limit its mercury discharge to 0.20 pounds per day based on a "six-month moving average" with the mercury discharge for any 24-hour period not to exceed 0.30 pounds. Monsanto on this appeal raises two issues: (1) whether the conditions imposed by the Board in granting the variance are supported by the evidence, and (2) whether the Board erred in concluding that it could only grant a variance for a one-year period.

Monsanto operates a large chemical plant in the Village of Sauget, Illinois, known as the William G. Krummrich plant. Monsanto owns approximately 350 acres in Sauget, of which 100 acres are occupied by the plant's main operating area. Waste water from the plant is discharged into the Village of Sauget sewer treatment system which empties into the Mississippi River.

The Krummrich plant produces approximately 1.2 billion pounds of chemicals each year, consisting of more than 70 different chemical products for use in the steel, rubber, agricultural, construction, drug, cosmetic, and other industries. Essential to the production of 80 percent of the chemical products made at the plant are chlorine, hydrogen, sodium hydroxide, and potassium hydroxide. These four chemicals are produced by a production unit known as the "chlor-alkili facility." Mercury is used solely as a conductor of electricity within the chlor-alkili facility. Although the system is designed for the complete recycling of the

mercury used, and although all effluent streams from the chlor-alkili facility are collected and passed through a mercury treatment system prior to discharge to the Sauget sewer system, nevertheless, some mercury is discharged into the Sauget sewer system.

The chlor-alkili facility is the only area of the Krummrich plant where mercury is used as part of the production process, although mercury is present in other parts of the plant in thermometers, switches, and other instruments, and in raw materials brought into the plant. Mercury is also present in the wastewater discharged into the Sauget sewer system from these other areas of the plant. The Board found that in 1974 the mercury discharged from the chlor-alkili facility averaged less than 0.1 lb/day and the mercury discharged from the other areas of the plant averaged approximately 0.15 lb/day, making a total average mercury discharge of 0.25 lb/day.[1]

In the past Monsanto has requested and been allowed variances for its discharge of mercury into the Sauget sewer system. In November of 1971 Monsanto was granted a variance limiting its discharge of mercury to 0.5 lb/day. In October of 1972 it was granted a variance limiting the discharge to 0.33 lb/day, based on a 6-month moving average, but not to exceed 0.5 lb/day in any given 24-hour period. And in November of 1973 it was granted a variance limiting its discharge to 0.25 lb/day, based on a 6-month moving average, but not to exceed 0.4 lb/day in any given 24-hour period. Because of its continued inability to meet the standards of Regulation 702(a), Monsanto sought the variance which is presently before us.

Before reaching the issues raised by Monsanto on this appeal it is necessary that we consider two motions which were taken with the case. The first is Monsanto's motion to strike portions of the brief and designation of excerpts from the record filed by respondents. The material objected to consists of data regarding mercury discharges, filed by Monsanto with the Board after the Board rendered the opinion which is the subject of the instant appeal. The data is from quarterly reports submitted by Monsanto to the Board during June and September 1975 and shows that in 5 of the 9 months from November 1974 through July 1975 Monsanto's average mercury discharge per day was within the 0.20 standard imposed by the Board.

The second motion taken with the case is respondents' "Motion to

---

[1] From Monsanto's Exhibit No. 4, which appears in the record on appeal, it is apparent that the average amount of mercury discharged from November of 1973 through January of 1975 was 0.075 lb/day from the chlor-alkili facility while the average amount from the remainder of the plant was 0.283 lb/day if the January 1974 discharge was included and 0.163 if it was not. In January 1974 a major failure of the effluent treatment system occurred which lasted 19 days and which caused the average daily discharge of mercury from parts of the plant other than the chlor-alkili facility to be 1.96 lb/day.

Correct Record" (which would more appropriately be called a "motion to supplement the record"). By this motion respondents ask this court to consider as part of the record the above-mentioned data as well as data from a quarterly report submitted by Monsanto to the Board in December 1975. The data from the latter report shows that Monsanto's 6-month average daily mercury discharge was 0.17 lb/day, 0.17 lb/day, and 0.16 lb/day at the end of September, October and November 1975, respectively.

The arguments with respect to both of these motions are the same. Monsanto argues that the data consists of "new or additional evidence in support of" the decision of the Board and, as such, cannot properly be considered by this court because of section 11 of the Administrative Review Act. (Ill. Rev. Stat., ch. 110, par. 274.) Respondents, on the other hand, argue that this information demonstrates that compliance with the Board's order was achievable without arbitrary or unreasonable hardship. Respondents further argue that this court should take notice of this information in the interest of judicial economy and efficiency and that this court can take such notice because the information renders moot the first issue on this appeal.

Section 11 of the Administrative Review Act provides:

"Every action to review any final administrative decision shall be heard and determined by the court with all convenient speed. The hearing and determination shall extend to all questions of law and of fact presented by the entire record before the court. *No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court.* The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Emphasis added.)

The constant statement of the supreme and appellate courts of this State, consistent with the clear language of the portion of section 11 of the Administrative Review Act emphasized above, has been that upon administrative review the court is limited to considering only the evidence submitted in the administrative hearing and may not hear further evidence or conduct a hearing *de novo.* (*Strohl v. Macon County Zoning Board of Appeals,* 411 Ill. 559, 104 N.E.2d 612; *Pipe Trades v. Rauch,* 2 Ill. 2d 278, 118 N.E.2d 319; *West End Savings & Loan Association v. Smith,* 16 Ill. 2d 523, 158 N.E.2d 608; *Curtis v. State Police Merit Board,* 349 Ill. App. 448, 111 N.E.2d 159; *Zito v. Illinois Liquor Control Com.,* 113 Ill. App. 2d 103, 251 N.E.2d 727; *Lake County Contractors Association v. Illinois Pollution Control Board,* 6 Ill. App. 3d 762, 286 N.E.2d 600, *aff'd,* 54 Ill. 2d 16, 294 N.E.2d 259.) Overriding this clear mandate, however, is the rule, recognized in Illinois both before and

after enactment of section 11 of the Administrative Review Act, that a court reviewing an administrative decision will dismiss the case, subject to certain limited exceptions, if the question presented has become moot. This rule has been applied both in cases in which the court on its own has become aware of facts making the question moot and in cases in which one of the parties has brought those facts to the court's attention by way of a motion to dismiss. *National Jockey Club v. Illinois Racing Com.*, 364 Ill. 630, 5 N.E.2d 224; *Railway Express Agency v. Commerce Com.*, 374 Ill. 151, 28 N.E.2d 116; *Central States Import & Export Corp. v. Illinois Liquor Control Com.*, 405 Ill. 58, 89 N.E.2d 903; *Maywood Park Trotting Association, Inc. v. Illinois Harness Racing Com.*, 15 Ill. 2d 559, 155 N.E.2d 626; *Goers v. Carpentier*, 27 Ill. App. 2d 355, 169 N.E.2d 858; *Daley v. License Appeal Com.*, 55 Ill. App. 2d 474, 205 N.E.2d 269.

A moot question has been defined as a question which presents or involves no actual controversy, interest, or rights of the parties, or which involves issues that have ceased to exist. *(People v. Redlich,* 402 Ill. 270, 83 N.E.2d 736; *La Salle National Bank v. City of Chicago,* 3 Ill. 2d 375, 121 N.E.2d 486.)* It is obvious from this definition that the question presented by the first issue on this appeal has not been made moot by the facts not part of the record made before the Board, which respondents have brought to our attention. We do not know what action Monsanto may be subjected to for those months during the variance period in which Monsanto was not able to comply. Nor do we know that Monsanto would ever again be able to repeat the compliance it achieved during some of those months. Perhaps most importantly, however, we do not know the reason for Monsanto's having been able to comply during those months to which respondents draw our attention. For all we know, compliance may have been achieved because a major part of the plant was not in operation during those months. Whatever was the reason for the compliance is a matter of speculation as far as this court is concerned, and we will not engage in such speculation either to find an issue moot or to find it not moot. Moreover, even if Monsanto were shown to have complied during every month within the variance time period, the mere fact of such compliance would not remove the power of this court to review the decision of the Board and grant appropriate relief if the Board's action was against the manifest weight of the evidence. (See *South Carolina Public Service Authority v. Federal Power Com.* (4th Cir. 1948), 170 F.2d 948, *cert. denied,* 336 U.S. 953.) In light of the above discussion, we find that the first issue presented for review is not moot. We also find that we are precluded from considering the data submitted by Monsanto to the Board subsequent to the Board's order of April 24, 1975, because of section 11 of the Administrative Review Act. We therefore allow Monsanto's motion to strike portions of respondents' brief and

designation of excerpts from the record and deny respondents' motion to "correct" the record.

■■ Monsanto's first contention on this appeal is that although the evidence supports the Board's finding that a variance should be granted, the limits imposed by the Board on Monsanto's mercury discharge are contrary to the manifest weight of the evidence. We agree. The rule in Illinois is that the findings of an administrative agency are deemed to be prima facie correct and on review the court cannot disturb such findings unless they are against the manifest weight of the evidence. (Ill. Rev. Stat., ch. 110, par. 274; *Fenyes v. State Employees' Retirement System,* 17 Ill. 2d 106, 160 N.E.2d 810; *Marion Power Shovel Co. v. Department of Revenue,* 42 Ill. 2d 13, 244 N.E.2d 598; *Cobin v. Pollution Control Board,* 16 Ill. App. 3d 958, 307 N.E.2d 191.) A reviewing court, however, will not hesitate to grant relief where the record does not disclose evidentiary support for the agency's determination *(Kerr v. Police Board,* 59 Ill. 2d 140, 319 N.E.2d 478), or where the decision was capricious or arbitrary. *Holiday Inns, Inc. v. Pollution Control Board,* 27 Ill. App. 3d 704, 327 N.E.2d 364.

In the instant case there was no evidence presented regarding the daily discharges of mercury by Monsanto over a period of time nor any other evidence upon which the Board could have arrived at the "0.30 pounds per any 24 hour period" limitation. It appears that the Board simply was intent on progressively "tightening the noose" with respect to the daily discharge standard, the previous "24 hour" limitations having been 0.40 lbs/day in the 1-year variance granted in November of 1973 and 0.50 lbs/day in the 1-year variance granted in October of 1972.

Furthermore, the record does not disclose evidentiary support for the Board's imposition of a 0.20 lb/day limitation based upon a 6-month rolling average. Indeed, the evidence showed that Monsanto had never been able to achieve a 6-month rolling average of 0.20 or below. Monsanto's Exhibit No. 4, which consists of data of Monsanto's monthly mercury discharge in pounds per day during the months from November 1973 through January 1975, states that Monsanto's 6-month rolling average at the end of each month from June 1974 through January 1975, respectively, was 0.633, 0.234, 0.226, 0.265, 0.262, 0.245, 0.241, and 0.175. It is obvious from a casual glance at the rest of the data in the exhibit that the January figure of 0.175 is the result of a mathematical error, since the figures from which that 6-month rolling average would have to be computed are 0.113, 0.402, 0.285, 0.248, 0.220, 0.194. There is no indication from the record that the Board arrived at the 0.20 lb/day limitation by relying upon this mistaken figure; and even if the Board had relied upon this mistaken figure, it would be unconscionable to conclude that Monsanto must blindly be held to such figure.

■■ There was considerable testimony by witnesses for Monsanto concerning the improvements Monsanto had made over the years with respect to its mercury discharge and concerning projects Monsanto was undertaking which were aimed at further improvements. The uncontradicted evidence was that in reaching the levels that it had, Monsanto was already employing the best technologically available methods of controlling its mercury discharge. Although Monsanto was undertaking various projects with respect to further control of its mercury discharge, all of the projects being undertaken by Monsanto, with the exception of water flow reduction projects, were aimed at stabilizing the amount of mercury discharged by Monsanto at the lowest levels that had been achieved. That is, the projects were aimed at eliminating the wide fluctuation in monthly discharges of mercury (ranging from a low of 0.113 lbs/day in August 1974 to a high of 2.57 lb/day in January 1974) by guaranteeing consistently repeatable performance at the lower range of discharge. The water flow reduction projects on the other hand, were aimed specifically at mercury discharge reduction rather than at repeatability of performance, since the amount of mercury being discharged would necessarily decrease along with decreases in the amount of water flowing from the Krummrich plant into the Sauget sewer system. The witnesses, however, continuously referred to the expected completion dates for all of these projects as being in 1976 or 1977. In light of the fact that the variance which is the subject of the instant appeal was to extend only until November 5, 1975, the Board could not rely upon improvements Monsanto might make through these projects which would not be completed until after the variance period had elapsed. We conclude that the limitation which the Board imposed of 0.20 lbs/day based upon a 6-month rolling average was against the manifest weight of the evidence.

Monsanto also contends in this appeal that the Board erred in concluding that it was without authority to grant a permanent variance and that its authority in situations such as that of the instant case was limited to granting variances not in excess of one year. The rationale for the conclusion reached by the Board in this regard is set forth in the following portion of the Board's opinion and order of April 24, 1975:

> "The Board notes that legislative intent is for the Board to not grant permanent variances, in that the General Assembly felt it necessary to amend the [Environmental Protection] Act to allow the Board to grant 5-year variance [sic] to those individuals required to obtain NPDES permits. As Monsanto's discharge is to the village of Sauget Sanitary Sewage Treatment Plant, no NPDES permit is required of Monsanto. Therefore, the Board may only grant one year variances in this case."

We find the Board's conclusion and the rationale upon which it based that conclusion erroneous.

Variances are governed by title IX, sections 35 through 38 of the Illinois Environmental Protection Act (Ill. Rev. Stat., ch. 111½, pars. 1035 through 1038). Section 35 provides in pertinent part:

"To the extent consistent with applicable provisions of the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92—500), and regulations pursuant thereto, the Board may grant individual variances beyond the limitations prescribed in this Act, whenever it is found, upon presentation of adequate proof, that compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship."

Section 36, at the time of the instant proceeding before the Board, read in pertinent part:

"(a) In granting a variance the Board may impose such conditions as the policies of this Act may require. If the hardship complained of consists solely of the need for a reasonable delay in which to correct a violation of this Act or of the Board regulations, the Board shall condition the grant of such variance upon the posting of sufficient performance bond or other security to assure the completion of the work covered by the variance. * * *

(b) * * * [A]ny variance granted pursuant to the provisions of this Section shall be granted for such period of time, not exceeding one year, except for variances for discharges for which a permit is required under Section 39(b) of the Act, which variances shall be granted for such period of time, not exceeding five years, as shall be specified by the Board at the time of the grant of such variance, and upon the condition that the person who receives such variance shall make such periodic progress reports as the Board shall specify. Such variance may be extended from year to year by affirmative action of the Board, but only if satisfactory progress has been shown."[2]

Prior to September 14, 1973, section 36(b) did not contain the language "except for variances for discharges for which a permit is required under

---

[2] "Section 39(b) of the Act" (Ill. Rev. Stat., ch. 111½, sec. 1039(b)), referred to in subsection (b) above, is the portion of the Illinois Environmental Protection Act which governs the granting of National Pollutant Discharge Elimination System (NPDES) permits. As indicated in the portion of the Board's opinion and order set forth above, the Board concluded that the instant case is not one requiring an NPDES permit. This conclusion is correct; for an NPDES permit is not required for industrial discharges to publicly owned sewage treatment plants, even though such a permit may be required for discharges by the publicly owned treatment plant itself and even though the discharges by the industrial user may be subject to Federal pre-treatment standards. (See 33 U.S.C. §1311(b)(1)(A) and (2)(A) and §1317(b) and (c) (1972 Supp.).)

Section 39(b) of the Act, which variances shall be granted for such period of time not exceeding five years." This language was included by amendment of section 36(b) by Public Act 78—862, effective September 14, 1973. The Board looked to the addition of this language and reasoned that the amendment demonstrated a legislative intent that the Board not grant permanent variances. We do not feel this amendment indicates any such intent on the part of the legislature. The apparent intent for this amendment was to achieve compliance with section 402(b)(1)(B) (33 U.S.C. §1342(b)(1)(B) (1972 Supp.)) of the Federal Water Pollution Control Act Amendments of 1972 (hereinafter "FWPCA") so that Illinois could obtain approval to administer its own State NPDES permit program. Under section 402(b)(1)(B) the Administrator of the Federal Environmental Protection Agency cannot approve a proposed State NPDES permit program unless such program provides adequate authority for the State water pollution control agency to issue NPDES permits for fixed terms not exceeding 5 years. Prior to the amendment of section 36(b) of the Illinois Environmental Protection Act by Public Act 78—862, the Pollution Control Board was limited to granting variances which were requested under section 36 for only up to 1 year, thus necessitating the amendment.

Since the Board's order and opinion of April 24, 1975, section 36(b) of the Illinois Environmental Protection Act has again been amended (by Public Act 79—1064, effective October 1, 1975) and now reads as follows:

> "(b) Except as provided by Section 38 of this Act, any variance granted pursuant to the provisions of this Section shall be granted for such period of time, not exceeding five years, as shall be specified by the Board at the time of the grant of such variance, and upon the condition that the person who receives such variance shall make such periodic progress reports as the Board shall specify. Such variance may be extended from year to year by affirmative action of the Board, but only if satisfactory progress has been shown."[3]

Respondents urge that the second issue before us is now moot, because this latest amendment shows that all variances (other than those under section 38) can now be granted for a period of time not exceeding 5 years. In our opinion, this latest amendment of section 36(b) has no bearing on the issue presently before us.

Section 36(b), as it now reads, as it read before the most recent amendment, and as it read in its original form, is limited in application to a specific type of variance. Other than the capitalization of the word

---

[3] "Section 38 of this Act" (Ill. Rev. Stat., ch. 111½, par. 1038), governs variances which are automatically granted for failure of the Board to take final action on a request for a variance, within a specified time.

"section" the opening words of section 36(b)—"Any variance granted pursuant to the provisions of this Section * * * "—have never been changed by any amendment.

Respondents argue that the words "this Section" were used by the legislature to mean "this Title," so that section 36(b) would apply to all of title IX of the Illinois Environmental Protection Act (Ill. Rev. Stat., ch. 111½, pars. 1035-1038), and thereby to all types of variances. This interpretation is utterly without foundation. Throughout the Environmental Protection Act the legislature consistently used the word "Title" whenever it wished to refer to a particular title of the Act rather than to a particular section. For a few such usages one need only look, for example, at sections 4, 5, 7.1, 9, 10, 11, 13, 20, 22, 25, 25a, 32, 41 and 43 of the Act. In addition to the references to "this Section," the legislature in section 36(b) itself also referred to "Section 39(b)" (before the most recent amendment) and to "Section 38" (in the most recent amendment). In light of the legislature's consistent and unambiguous usage of the words "Section" and "Title," the words "this Section" can only refer to section 36 and not to all of title IX.

Section 35 of the Environmental Protection Act is a general statement of the Board's authority to grant an individual variance whenever requiring compliance would "impose an arbitrary or unreasonable hardship." On the other hand, section 36, at least from the second sentence on, speaks of a specific type of variance, namely, one which is granted because the "hardship complained of consists solely of the need for a reasonable delay" in order to come into compliance. If, for instance, a party seeking a variance has the technological ability to comply and would in fact be complying but for the fact that a certain amount of time is needed to put that ability into effect, the variance proceeding will be governed by the provisions of section 36. In considering the party's request for a variance the Board will be required to have the party post a performance bond or other security to insure compliance and the Board will only be able to grant a variance within the time limits set in section 36(b). If, however, the need for additional time is not the only barrier to compliance (as, for example, where it is not technologically possible to comply), then the Board is not required to have a bond or other security posted nor is it constrained by the time limitations of section 36(b). Thus a variance sought pursuant to section 35, but not subject to the limitations of section 36, can be granted for whatever period of time the Board finds justified subject only to the condition that the variance granted must be consistent with applicable provisions of the FWPCA, and regulations pursuant thereto.

■■ As we have pointed out above, an NPDES permit is not required of an industrial user of a publicly owned sewage treatment plant.

However, the industrial user is required by section 301(b) of the FWPCA (33 U.S.C. §1311(b) (1972 Supp.)) to comply with the pre-treatment standards established by the Administrator of the Federal Environmental Protection Agency pursuant to section 307(b) of the FWPCA (33 U.S.C. §1317(b) (1972 Supp.)). Under section 307(b)(1) the industrial user must comply with the pre-treatment standards promulgated by the Administrator within the time period specified in the standards (which cannot exceed 3 years). We need not consider on this appeal whether Monsanto's mercury discharge to the Sauget sewer system is in compliance with the applicable pre-treatment standard promulgated by the Administrator. We have concluded that the Board erred in finding that it was only authorized to grant a one-year variance in the instant case. We leave it to the Board upon remand to consider in light of what we have said here and in light of the applicable Federal pre-treatment standard, what length of time the variance requested by Monsanto should properly be granted.

Because in the instant case we have concluded that the conditions imposed by the Board in granting the variance to Monsanto were against the manifest weight of the evidence, and because we have concluded that the Board erred in ruling that it could only grant a variance for up to 1 year, we reverse the decision of the Board and remand for further consideration not inconsistent with the law as set forth in this opinion.

Reversed and remanded.

CARTER, J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:
I would dismiss this appeal because the issues are moot.

The majority opinion recognizes that a court reviewing an administrative action may take notice of facts not in the record that would render an issue on appeal moot, but concludes that the question of whether the conditions imposed by the Board in granting the April 24, 1975, variance to Monsanto are against the manifest weight of the evidence is not made moot by the fact that Monsanto was in compliance with those conditions for the last 6 months of the variance period. A question becomes moot when it no longer involves an actual controversy *(People v. Redlich,* 402 Ill. 270, 83 N.E.2d 736; *La Salle National Bank v. Chicago,* 3 Ill. 2d 375, 121 N.E.2d 486), or where some event has occurred which makes it impossible to render effective relief on the ultimate merits of a controversy *(Barnard v. Michael,* 392 Ill. 130, 63 N.E.2d 858; *Meyer v. Marshall,* 62 Ill. 2d 435, 343 N.E.2d 479).

The opinion concludes that the issue remains ripe for adjudication

because there is no evidence indicating why Monsanto was able to comply with the variance conditions for the last 6 months of the variance period; because Monsanto may be subject to an enforcement action for those months during the variance period in which it was unable to comply; and because Monsanto may never again be able to repeat the compliance it achieved during those months.

The variance period, however, has expired and unless it can be shown that Monsanto will be subject to prosecution for those months of the variance period in which it was not able to comply with the variance conditions or that a decision by this court to let the variance stand will adversely affect Monsanto in subsequent variance proceedings, the issue of the validity of the variance conditions must be declared moot (see *Holiday Inns v. Pollution Control Board* 27 Ill. App. 3d 704, 327 N.E.2d 364, in which this court held that the issue of whether the Board's denial of a requested variance from compliance with effluent standards for one year was arbitrary and caused unreasonable hardship was moot where the time period for which the variance was requested or could have been granted had expired, and since no proceedings were ever brought to impose a penalty for violation).

The opinion speculates that Monsanto may be subject to prosecution for the months of noncompliance. On April 24, 1975, the Board entered its opinion and order granting Monsanto a variance from November 5, 1974, to November 6, 1975. The Board imposed as conditions of the variance the requirements that Monsanto limit its mercury discharge to 0.20 pounds per day based on a 6-month moving average with the mercury discharge for any 24-hour period not to exceed 0.30 pounds. The motions presently before this court concern data relating to the .20 standard compiled subsequent to the Board's April 24, 1975 opinion and order. The data is from quarterly reports submitted by Monsanto to the Board in June, September and December of 1975 and shows the following pattern of compliance with the .20 lbs. per day/6-month moving average standard.

Six-month average daily discharge, 1975:

| | | | |
|---|---|---|---|
| February | - .257 | July | - .193 |
| March | - ..219 | August | - .180 |
| April | - .210 | September | - .170 |
| May | - .209 | October | - .170 |
| June | - .201 | November | - .160 |

The majority's concern that Monsanto may be open to prosecution must be examined with reference to this pattern of compliance. Three separate periods of the variance year (November, 1974 to November, 1975) are relevant in making a determination as to Monsanto's

vulnerability to prosecution; the period for which a variance was granted retroactively (November, 1974 to April, 1975), the period following the April 24 variance during which Monsanto was unable to comply with the .20 standard and the period following the April 24 order in which Monsanto was in compliance with the .20 standard. Monsanto's 6-month daily average mercury discharge from June 1975 through November 1975 did not exceed the .20 standard. (Although the average daily discharge for June was .201 lbs. per day, rounding this figure off so that it is consistent with the .20 standard results in average daily discharge for June of .20.) For the last 6 months of the variance year, Monsanto was in compliance with the standard imposed by the variance and Monsanto is therefore not subject to prosecution for this period.

The second period of the variance year relevant to the question of Monsanto's vulnerability to prosecution is the period from November 1974 through April 1975 for which the variance was granted retroactively (as the variance was granted on April 24, that month is effectively within the period of the retroactive grant). By imposing retroactively a variance condition that was not met during any month within the period of the retroactive grant, the Board, in effect, was imposing a penalty as a condition of the variance. The grant of the variance put Monsanto into immediate noncompliance with a discharge standard that Monsanto never had an opportunity to even attempt to comply with.

Section 36(a) of the Environmental Protection Act authorizes the Board to impose upon the grant of variances "such conditions as the policies of this Act may require." This section contemplates the use of variances as an enforcement tool. By conditioning a variance order on adherence to a specific compliance schedule, including interim and final standards, the Board can encourage an increasing level of compliance with the standards of the Act and the P.C.B. regulations, and, with the addition of a regular reporting requirement (Ill. Rev. Stat. 1973, ch. 111-½, par. 36(a)) can assure that the holder of the variance is in compliance with the promised schedule and can take prompt corrective action if it is not. (See *Marquette Cement Manufacturing Co. v. E.P.A.*, 1 P.C.B. 145, 149.) To impose a discharge standard retroactively for a 5-month period during which the standard had already been exceeded, and to subject Monsanto to prosecution for noncompliance with that retroactive standard clearly would conflict with the purposes of section 36. More important, a variance order that automatically subjects a petitioner to prosecution for noncompliance with that condition is in effect imposing a penalty as a condition of the variance, and, Illinois courts have repeatedly held that the Environmental Protection Act does not authorize penalty conditions *(Citizens Utilities Co. v. Pollution Control Board.*, 9 Ill. App. 3d 158, 289 N.E.2d 642; see also *Molex, Inc. v. Pollution Control Board,* 9 Ill. App. 3d

1032, 293 N.E.2d 731; *Agrico Chemical Co. v. Pollution Control Board,* 13 Ill. App. 3d 45, 299 N.E.2d 803). To the extent that the April 24 variance subjects Monsanto to prosecution for noncompliance with the variance condition during the months of November 1974 through April 1975, that condition is invalid, and this court must therefore conclude that Monsanto is immune from prosecution for that period.

The final period of the variance year for which Monsanto could possibly be prosecuted for noncompliance with the .20 standard is the month of May 1975. The 6-month average daily discharge for May, rounded off to be consistent with the .20 standard, was .21 pounds per day. Although this court has noted that the grant of a variance does not necessarily foreclose enforcement proceedings for a violation of the Board's regulations *(Holiday Inns, supra),* a successful petitioner's vulnerability to such prosecution must be limited to the situation where the Board specifically grants a variance from the discharge standards to the extent of permitting continued operation without prejudice to the later imposition of penalties. (See, for example, *Kankakee Foundry Co. v. E.P.A.,* 4 P.C.B. 467, 468-69.) To hold that a variance never provides any protection to a successful petitioner clearly would conflict with the purposes of the variance provisions of the Act, and would effectively render those provisions inoperative.

Section 35 of the Act provides for the grant of an individual variance upon a showing that a requirement of the Board would impose an arbitrary or unreasonable hardship. Before it can grant a variance, the Board must therefore determine whether a petitioner's claim of unreasonable hardship is justifiable. If the Board grants a variance without specific reservation of the right to impose later penalties, it must be assumed that the Board found the petitioner's claim to be justified. A necessary concomitant to such a finding is the implication that the Board did not intend that the successful petitioner should be later penalized for its noncompliance. This position is consistent with objective of the variance provisions to encourage a continuing effort toward compliance with the Board's standards. The efficacy of this policy of encouragement and the paucity of the view that a variance never provides protection from prosecution to the successful petition is well illustrated in this case. Monsanto's performance during the variance year reflects a genuine good faith effort to achieve compliance with the conditions of the variance and these efforts in fact resulted in substantial compliance with those conditions. To subject Monsanto to prosecution for the single month of May in which Monsanto exceeded the discharge standard (after April 24 order) of the variance condition by .009 pounds per day would frustrate the policy of encouragement and would promote instead a policy of arbitrary prosecution that would discourage good faith efforts to comply.

In order to be consistent with the purposes and objectives of the Act, this court must conclude that Monsanto is immune from prosecution for its apparent and partial noncompliance with the conditions of the April 24 variance.

Two other concerns led the majority to conclude that the issue of the validity of the .20 standard is not rendered moot by the introduction of the additional data. Both these concerns relate to the potential adverse effect on Monsanto in future variance proceedings of a refusal by this court to invalidate the variance. The opinion notes that there is no evidence showing why Monsanto was able to comply during the last 6 months of the variance year, nor is there any indication that Monsanto would be able to repeat the compliance it achieved during those months. Having determined that Monsanto is immune from prosecution for the variance year, both for its noncompliance with Board regulations and the conditions of the variance, these concerns are relevant only with respect to a future variance proceeding in which this court's decision to let the April variance stand might be taken as a conclusion that Monsanto was able to comply with the .20 standard, without regard to the reasons for this compliance. In a subsequent variance proceeding, however, Monsanto will have the opportunity to present such evidence and to show that a .20 standard would impose an unreasonable hardship. The majority engages in speculation by suggesting that because the court does not know that Monsanto will be able to comply in the future, Monsanto's rights in a future action might somehow be prejudiced and therefore an actual controversy on the issue of the validity of the standard continues to exist. A Board order, however, insofar as it raises the possibility that a successful petitioner may be required at some time in the future to take further abatement action, does not raise any issue ripe for judicial determination. (*Freeman Coal Mining Corp. v. Pollution Control Board*, 21 Ill. App. 3d 157, 313 N.E.2d 616.) This court cannot predict what action the Board might take on a future variance application by Monsanto nor can it make any assumptions regarding the evidence that may be offered in support of the application. Therefore, the majority improperly bases its conclusion regarding the mootness of the first issue on appeal on mere speculation as to the Board's and Monsanto's future actions.

The suggestion that the Board may grant permanent variances is unreasonable and contrary to the stated policy of the Act to establish a statewide program to restore, protect and enhance the quality of the environment. The development of pollution control technologies does not result solely from the initiative of polluting industries. Rather, it occurs largely in response to emission and discharge standards that are established through the legislative and administrative process for the protection of the general public. Monsanto contends that it is presently

technically impossible to meet the Board's mercury discharge standards and on that basis requests a permanent variance. This request, however, assumes that no future advances in mercury control technology will be made, an assumption that is clearly unsound. One might ask if Monsanto makes a similar assumption regarding technological advances in chemical production processes. The only reasonable conclusion that can be drawn from an examination of the purposes of the Act and the requisites of effective pollution control is that the Act does not authorize the granting of permanent variances.

Section 35 of the Act provides that the Board may grant individual variances beyond the limitations prescribed in the Act, whenever it is found, upon presentation of adequate proof, that compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship.

Section 36(a) of the Act provides for the imposition of conditions and the posting of security and section 36(b) sets out the time limits for variances "granted pursuant to the provisions of this section." The majority appears correct in its conclusion that the most recent amendment of 36(b) has no bearing on the issue of a permanent variance.

Section 35 is a general statement of the Board's authority to grant an individual variance. Section 36(a) is concerned with two specific types of variances—(1) a variance accompanied by the imposition of certain conditions, and (2) a variance where the hardship complained of consists solely of the need for a reasonable delay in which to correct a violation, apparently not contemplating a situation where there are other barriers to compliance such as the lack of presently feasible control technologies.

The plain language of 36(b) of the Act indicates that the time limitations therein apply to the variances of 36(a). The majority, however, curiously exempts from the time limitations of 36(b) the conditional variance set out in the first sentence of 36(a). Despite the clear language of 36(a), the majority concludes that if "the need for additional time is not the only barrier to compliance * * * [in reference to the second part of 36(a). * * * then the Board is not required to have a bond or other security posted nor is it constrained by the time limitations of 36(b)." This interpretation is clearly unwarranted.

If the majority wishes to label ambiguous a section of the Act that is not ambiguous, it should bear in mind that administrative agencies, under their discretionary power to make decisions and determinations, have the authority to construe statutory provisions. (*Sugden v. Dept. of Public Welfare*, 20 Ill. 2d 119, 169 N.E.2d 248.) In addition, the agency's determinations of the law will be accorded great weight and will, in

general, control whenever the question is doubtful or open to reasonable debate. *Nye v. Foreman,* 215 Ill. 285, 74 N.E. 140.

The Board has repeatedly held that it has no authority to issue variances that are exempt from the limitations of 36(b). (See 2 P.C.B. 483, 486; 2 P.C.B. 627, 634; 14 P.C.B. 661, 666.) Monsanto, however, offers two cases in which the Board granted variances without imposing any time limitations. See 2 P.C.B. 63; 2 P.C.B. 200.

A reasonable conclusion to be drawn from these cases is that section 35 does in some instances allow for the grant of permanent variances. A comparison of the two "permanent variance" cases mentioned above with the situation in the present case should illustrate the reasonableness of this interpretation. Both the permanent variance cases involved the connection of a residence to a community sewer line, subject to the Board's sewer ban. The principal issue before the Board in these cases was whether the connection of an additional residence would place an unreasonable burden on the local sanitary district. The Board determined in both cases that the hookups would not burden the local system and in light of the potential hardship to the petitioners, granted permanent variances. The only concern of the Board was with the initial connection and the additional quantity of sewage that would result. Having resolved that problem, a permanent variance was in order.

In contrast, the variance in this case involves a question of quantity and quality over a period of time. Monsanto continuously discharges into the sanitation system a dangerous poison at levels exceeding minimum health standards. The magnitude of the health hazard posed by these discharges and the essential requisites of effective control of them demand a much more strict variance procedure than the general one enumerated in section 35. This is provided by the conditional variance of 36(a) and the time limitations of 36(b). There is nothing within the statute that expressly, or impliedly, can be said to authorize a permanent conditional variance. The suggestion on its face presents a contradiction in terms. A court cannot insert a provision into a statute not placed there by the General Assembly, and since the Board's conclusion that it cannot grant a permanent variance to Monsanto is not in plain conflict with any provision of the Act, it must be upheld as a reasonable exercise of its discretion.

Then, too, section 35 of the Illinois Environmental Protection Act (Ill. Rev. Stat., ch. 111½, par. 1035) provides in part that "[t]o the extent consistent with applicable provisions of the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92—500) and regulations pursuant thereto, the Board may grant individual variances beyond the limitations prescribed in this Act." The Federal Water Pollution Control Act provides

that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." (33 U.S.C. 1251(a)(1) (1972 Supp.).) The suggestion that a variance may be granted from the water pollution standards of the PCB for an indefinite period of time is wholly inconsistent with the purposes and objective of the Federal Water Pollution Control Act. A permanent variance would thus violate the mandate of the Illinois Environmental Protection Act requiring that variances be consistent with applicable provisions of the Federal act.

The majority also holds that the limits imposed by the Board on Monsanto's discharge of mercury are contrary to the manifest weight of the evidence. A review of this case on its merits, however, requires that we employ a different scope of review to the Board's grant of the conditional variance than that comprehended by the manifest weight of the evidence standard and that we find that the Board did not arbitrarily impose the .20 lb/day standard as a condition to the variance. Since Water Pollution Regulation 702(a) is a general rule mandate from the Illinois Legislature, it has the force of law until it is repealed or set aside. The variance sought is an authority for petitioner to use his property in a manner forbidden by law. Petitioner therefore bears a heavy burden to establish his right to a variance.

The scope of judicial review of an action of the Pollution Control Board will vary depending on the character of the particular Board function to be reviewed. The scope of review with regard to the exercise of a legislative power differs from that applicable to an action that is adjudicatory in nature because a reviewing court is more suited to a review of judicial decisions involving the weighing of evidence and determination of individual rights than it is to a review of legislative actions based on agency expertise. *Federal Power Com. v. Colorado Interstate Gas Co.,* 348 U.S. 492, 99 L. Ed. 583, 75 S. Ct. 467. Legislative actions such as the exercise of an agency's rule-making function are afforded a presumption of validity and will not be set aside unless they have been clearly arbitrary, unreasonable or capricious. (*Illinois Coal Operators Association v. Pollution Control Board,* 59 Ill. 2d 305, 319 N.E.2d 782.) The "arbitrary and capricious" standard relates to the depth of inquiry on questions that are open to review, and it comprehends a very limited review as opposed to a full and independent consideration of evidence and determination of a court. Judicial review under this standard seeks to determine the rationality and reasonableness of an agency action and not the rightness of agency findings of fact.

Judicial review of the exercise of an agency's adjudicatory functions, on the other hand, has a broader scope and involves a closer examination of the evidence. The established scope of review of an agency action that is adjudicatory in nature is limited to ascertaining if the agency decision was

contrary to the manifest weight of the evidence. *Kerr v. Police Board,* 59 Ill. 2d 140, 319 N.E.2d 478.

A determination of the proper scope of review of an agency's findings of fact must be based upon an analysis of the particular reasons for the creation of the agency function in question and whether the exercise of that function is legislative or adjudicatory in nature.

Section 35 of the Act (Ill. Rev. Stat., ch. 111½, par. 1035) provides in pertinent part:

> " * * * the Board may grant individual variances beyond the limitations prescribed in this Act, whenever it is found, upon presentation of adequate proof, that compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship."

Section 36(a) of the Act provides in part that "[i]n granting a variance the Board may impose such conditions as the policies of this Act may require."

This represents a fairly broad delegation of power which allows the Board to determine, on the basis of the evidence offered by a petitioner for a variance, whether the Act and rules promulgated pursuant thereto are arbitrary and unreasonable as applied to the petitioner. Moreover, even where the Act and/or Board regulations are deemed unreasonable as applied to a particular polluter, the Board may impose conditions on the grant of a variance that in the Board's own judgment are required by the policies of the Act. The variance provisions are essentially a constitutional safety valve, providing a convenient method for determining the validity of a particular provision of the Act or Board regulation as applied to an individual polluter and thus avoiding a continual invalidation and re-enactment of entire statutory provisions and regulations simply because they may be invalid in a particular case. Pollution control is an exercise of a State's police power and involves the subordination of private property rights to reasonable regulation where necessary to preserve the health, safety and general welfare of the people. Even though a particular legislative enactment under the State's police power is reasonable, however, application of the statute to a particular situation may be unreasonable where the individual hardship incurred is not justified by the public purpose being served. A variance procedure preserves the constitutionality of police power measures by allowing for a modification of the general terms of such measures where individual applications are unreasonable. An agency acting pursuant to a variance provision in a statute, therefore, is performing a legislative function in the sense that it is acting for and in completion of the work of the legislature.

The Board is granted discretionary authority to grant or deny a variance, a grant virtually identical to that given by legislature to zoning

boards of appeals. (Ill. Rev. Stat., ch. 24, par. 11—13—4.) When an action of a zoning board of appeals on a petition for a variance is under review, a court will not interfere with the exercise of the board's vested discretionary administrative authority in the absence of a showing that it was exercised in an arbitrary or capricious manner. *(Ziman v. Village of Glencoe,* 132 Ill. App. 2d 399, 270 N.E.2d 537.) Decisions on both zoning variances and pollution control variances require a balancing of the threat to the public health and safety presented by a particular activity against the individual hardship which will result from regulation of that activity. Broad administrative discretion and a limited scope of judicial review is required because of the impracticability of devising precise statutory provisions or rules applicable to every situation that embodies a reasonable balancing of public harm against individual hardship.

Two other considerations make a limited scope of review of variance decisions more imperative in the area of pollution control than in zoning. The regulation of pollution is inevitably more complex than the regulation of land use, requiring the development and application of highly specialized scientific expertise. Courts are ill-equipped to deal with the technical complexities of pollution regulation and they should not be involved in an in depth consideration of scientific evidence in an area in which they have no expertise. In addition, pollution control problems in many cases involve a much more significant threat to the public health and welfare than land use control problems and, as a result, demand a greater degree of administrative flexibility if the public is to be properly protected. The scope of judicial review of variance decisions by the Board then is limited to an assessment of whether the Board's determination was arbitrary and capricious and such review does not involve an extensive weighing of the evidence considered by the Board. Moreover, where the problem of regulation under consideration is particularly complex or the pollution extremely hazardous, a reviewing court must presume that the Board's decision is reasonable and should not set a decision aside unless it clearly exceeds the Board's authority under the Act.

Variances from pollution control regulations may be granted only if it is determined that the hardship of compliance outweighs the cost to the community of noncompliance. The balance is in favor of compliance and in some cases may even require the closing of a particular source of pollution. *(GAF Corp. v. EPA,* 2 ERC 1463 (Ill. PCB 1971); *Bortz Coal v. Air Pollution Com.,* 2 ERC 1744 (Pa. 1971).) The burden in a variance proceeding is on the petitioner to show that the balance of continuing harm against individual hardship is heavily in its favor. *(GAF Corp. v. EPA.)* A petitioner must make allegation and proof of both the costs and the benefits of compliance and noncompliance.

Conflicting evidence was presented on the adverse environmental impact of Monsanto's mercury discharge. Monsanto's sampling of the Mississippi River indicates that a minimum amount of mercury is being discharged into the river while the analysis of fish samples shows a significant increase in mercury concentration in the fish taken downstream from the discharge point over the concentration in those taken upstream. Considering the severe health hazard presented by the discharge of this highly toxic poison into the Mississippi River, the Board's imposition of a .20 lb/day standard attached to the grant of the variance is clearly reasonable and not an abuse of its discretion. Moreover, petitioner's own exhibits demonstrated that the .20 lb/day limit had been achieved in 5 of the 15 months preceding the filing of the petition, indicating that the hardship of compliance with the conditions of the variance cannot be very significant. The Act does not impose upon the Board a requirement of establishing a record to justify its decision to grant or deny a variance or to impose conditions on the grant of a variance; rather, it requires a petitioner for a variance to make a compelling showing that the hardship that will result from compliance with the regulations or standards substantially outweighs the cost to the public of noncompliance. This burden was entirely the petitioner's and the Board's imposition of the .20 lb/day standard was not an abuse of discretion.