THE FLINTKOTE COMPANY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Fifth District   No. 76-122

Opinion filed October 4, 1977.—Rehearing denied November 14, 1977.

G. MORAN, J., dissenting.

Edward Benecki, of Gosnell, Benecki, Borden & Enloe, Ltd., of Lawrenceville, for petitioner.

William J. Scott, Attorney General, of Springfield (George W. Tinkham and Russell R. Eggert, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE JONES delivered the opinion of the court:

This is a petition pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1041) for review of orders of the Pollution Control Board entered in their cause number PCB 75-381 on January 8, 1976, and February 19, 1976. The cause is concerned with the extension of a variance order previously granted by the Board but upon conditions more restrictive than those previously set. Petitioner contends the conditions are not justified or permitted by the evidence before the Board. We consider the case to be controlled by *Monsanto Co. v. Pollution Control Board*, 67 Ill. 2d 276, filed March 1977, and accordingly affirm as to the conditions imposed.

Petitioner operates a mill at Mt. Carmel, Illinois that processes pulp wood, waste paper, and other materials into a felt product used in the manufacture of roofing materials. The wood fibers and waste paper containing different types of chemicals are mixed with water and turned

into a slurry which is fed into the manufacturing system until reaching forming machines to make the paper felt. The slurry is carried as fibers in the water which deposit it in a web or endless belt, the process water going back into the system. Prior to the abatement program petitioner discharged between 500,000 and 700,000 gallons per day of effluent containing 3,600 gallons of deoxygenating wastes (BOD5) per day and 4,000 pounds of suspended solids per day into the Wabash River.

The discharges into the Wabash River have been the subject of three previous proceedings before the Board culminating with the *Flintkote Co. v. Environmental Protection Agency*, PCB 75-89. The proceedings, testimony and exhibits taken in all of these cases including the Board's finding of facts and orders entered in each of the cases were made a part of the evidence in the instant case. Prior to an order of the Board entered on May 10, 1973, petitioner had not recycled any of its processed water. The May 10, 1973, order referred to and incorporated a stipulation and settlement in which petitioner agreed to undertake a two-phase compliance program which, when completed, would bring petitioner's operation into compliance with the Act and the Board's water pollution regulations. The first phase of the program, the mechanical construction phase, was ordered to be completed within 13 months and 10 days of the date of the order. Phase I was completed on schedule in June of 1974. It achieved a 75% reduction in the daily flow of waste water to the Wabash River, a reduction of BOD5 discharged to 2,800 pounds per day and a reduction of suspended solids to 250 to 500 pounds per day. These levels were reached by recycling most of the process water through the felt product itself, thereby using the felt as a filter to trap impurities in the water and maximizing utilization of raw materials.

Phase II of the abatement program commenced immediately upon the completion of phase I. The goal of this phase was the total recycling of the process water in a closed system with no discharge of waste into the Wabash River. Because of the experimental nature of phase II petitioner was granted a variance in PCB 74-89 until October 5, 1975, to complete the work on the system. The variance granted was from section 12(a) of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1012(a)), Rules Nos. 203(a), 402, 403, 404(a)(ii) and 404(b)(ii), of the Illinois Pollution Control Board. The variance order was granted upon the following (pertinent) conditions:

"2. (b) Flintkote's effluent, with the exception of cyanide and mercury, shall not, at any time, exceed 5 times, on either a grab or composite sample basis, the numerical standards provided in Rule 408(a); and

\* \* \*

(d) Flintkote's discharge of 408(a) contaminants shall not cause a

violation of Rules 203(f)[3] and 402 of the Water Regulations in the Wabash River; and

\* \* \*

3. Flintkote's waste water discharge during this variance shall be limited to:

(a) 125,000 gallons per day;

(b) 250 pounds per day of suspended solids as a monthly average, not to exceed 500 pounds on any day; and

(c) 2,800 pounds per day of $BOD_5$."

Petitioner proceeded to implement the second phase of the pollution control program. Experimental polymers and other chemicals were added to the manufacturing process. These chemicals operate as flocculant agents to allow the impurities in the process water to be more easily retained in the product when strained through the felt sheet. The company relied on the experience and advise of the suppliers of the necessary chemicals. Some of the advise was unsatisfactory, resulting in economic loss caused by lost product and shut down time. Determining that it could not complete phase II on schedule, petitioner filed the instant request for a 12-month extension. At the time this request was filed petitioner had progressed to an average daily discharge of 43,000 gallons of effluent, containing 1,927 pounds of $BOD_5$ and 83 pounds of suspended solids. By the date of the hearing on petitioner's request for an extension, petitioner had been able to recycle all but 18,000 gallons per day of waste water, 900 pounds per day of $BOD_5$ and 20 to 35 pounds of suspended solids.

At the hearing petitioner presented evidence that it needed a limitation of at least 125,000 gallons per day of effluent discharge because of the possibility of an upset in the system that would require a major shut down to repair or replace machinery. Frank Veronsky, petitioner's manufacturing manager, testified that if the company made a mistake in adding chemicals, it would take too long a time to purge the system at the rate of 18,000 gallons per day. He also stated that in the event of a "flood out" or the discovery of a new polymer, the system would have to be immediately and completely drained.

The record shows that petitioner is still experimenting with the chemical balance necessary to achieve a totally recycling system without upsetting the production of felt. Veronsky stated that petitioner has experienced eroding and corroding of its piping system and the depositing of natural resin and tars, both pitches, upon its machinery. Veronsky explained that the coating of resins on the machinery was attributable to the further recycling of its process water under phase II and that it was necessary to add a pitch dispersant that would be chemically compatible with the polymers to alleviate this problem. At the

time of the hearing the proper pitch dispersant had not been found. The record indicates that another possible solution to the pitch problem was to cool parts of petitioner's recycling system. As a result of both the pitch and corrosion problems the company has experienced production declines.

The Environmental Protection Agency presented no evidence at the hearing.

Following the hearing the Board entered its order of January 8, 1976, as modified by the order of February 19, 1976, which reads in material part as follows:

"1. Flintkote is hereby granted variance until September 1, 1976 for its discharge of process waters at that Mt. Carmel facility from Section 12(a) of the Act as it relates to BOD and suspended solids, from Rule 403, and Rules 404(a) and 408(a) as they pertain to cyanide, subject to the following conditions:

* * *

(c) Flintkote's waste water discharge during this variance shall be limited to:

(i) 20,000 gallons per day;

(ii) 30 pounds per day of suspended solids as a daily average; and

(iii) 900 pounds per day of $BOD_5$; and

* * *

6. Within 35 days after the date of the Board Order herein, The Flintkote Company shall execute and submit to the Manager, Variance Section, Division of Water Pollution Control, Illinois Environmental Protection Agency, 2200 Churchill Road, Springfield, Illinois 62706, a Certificate of Acceptance and agreement to be bound to all terms and conditions of the Variance. The form of said certification shall be as follows:

I, (We), ———————————— having read the Order of the Illinois Pollution Control Board in case No. PCB 75-381 understand and accept said Order, realizing that such acceptance renders all terms and conditions thereto binding and enforceable.

(Signature Lines included)"

Petitioner's first argument regarding the absence of evidence to support the order of the Board is controlled by *Monsanto Co. v. Pollution Control Board*. In that case this court held (39 Ill. App. 3d 333, 350 N.E.2d 289) that the variance order conditions fixed by the Board were contrary to the manifest weight of the evidence. The supreme court held (67 Ill. 2d 276) that the manifest weight of the evidence rule generally applicable to findings of an administrative agency were not applicable in evaluating the conditions attached by the Board in granting variances. The court stated:

"The setting of conditions, unlike the decision to grant a variance, is not quasi-judicial in nature, but rather is one manifestation of the power granted the Board to act as the policy-making body. Section 36 of the Act is a rather broad delegation to the Board of power to impose whatever conditions are necessary to effectuate as nearly as possible the policies of the Act when a variance from statewide standards is granted. * * * The Board, unlike this court, is well equipped to determine the degree of danger which a pollutant will cause, and then to balance that public threat against an alleged individual hardship and reach a conclusion as to what limits should be placed upon a temporary variance. The power granted to the Board by section 36 is tantamount to the quasi-legislative power to make prospective regulations and orders. (See *Illinois Central R.R. Co. v. Franklin County* (1944), 387 Ill. 301.) When a regulation is promulgated by an agency pursuant to a grant of legislative power, a reviewing court should not substitute its judgment as to the content of the regulation, because the legislature has placed the power to create such regulations in the agency and not in the court. (Davis, Administrative Law sec. 5.03 (1958).) Since in setting interim discharge standards the Board is, in effect, making future policy pursuant to the legislative delegation of section 36(a), we must be just as circumspect about interfering with the Board's discretion in establishing variance conditions as we are in dealing with the enactment of regulations. In summary, then, the proper scope of review of conditions limiting a variance is the same as that applied to board regulations in *Illinois Coal Operators Association:* whether the Board's action was arbitrary, unreasonable, or capricious." 67 Ill. 2d 276, 290-91.

■■ The court then balanced the hazard to the public caused by the discharge of mercury by Monsanto against the hardship to Monsanto imposed by the condition in the variance order. In the balancing process they considered Monsanto's argument that it was impossible to comply with the condition fixed by the Board with existing technology. The condition imposed was a .2 pounds per day of mercury discharge. Monsanto argues that although it had in individual months achieved the .2 pounds per day limitation it was not possible to do so over a six months period. The court deferred to the judgment of the Board and found that the setting of the .2 pounds per day limitation was not arbitrary or capricious in the sense that it was arrived at without deliberation or foundation.

"In granting or denying a variance, and in setting interim standards once a variance is granted, the Board must balance individual hardship against environmental impact. Inability to comply with a

State standard does not make mandatory the granting of a variance. Likewise, inability to limit discharge to the level prescribed by a condition of a variance does not require the Board to change that level. It is well within the power of the Board, in safeguarding the public health, to determine what is the maximum pollution tolerable from any one source, and to refuse to permit deviations from that maximum even when faced with protestations of impossibility. A concomitant of this absolute power is the commonly exercised prerogative of the Board to promulgate 'technology forcing' standards. That is, to hasten ultimate compliance with a statewide standard, the Board may establish an interim standard which, though not impossible to satisfy, is beyond the polluter's present technical capability. *In short, it is not necessarily arbitrary and capricious conduct for the Board to set a standard which a petitioner cannot adhere to at the present time, or, if absolutely necessary to protect the public, set a standard with which there can be no foreseeable compliance by petitioner.* [Emphasis supplied.]

\* \* \*

In fulfilling its mandate to safeguard the public health, the Board can deny a variance, or, as in this case, set stringent conditions upon a variance, when it is necessary to do so to limit the total amount of a contaminant discharged by Monsanto's plant *from whatever source*, to levels which do not threaten the public welfare. The hardship this causes an individual petitioner is never a justification for endangering public safety." 67 Ill. 2d 276, 292-95.

■■ The factual situation with which petitioner is faced in this case is remarkably similar to that of *Monsanto.* They have achieved at times a rate of discharge of effluent containing suspended solids and $BOD_5$ in quantities which they contend they cannot, with existing technology, maintain as an ongoing process. Nevertheless, under the direction of *Monsanto* we cannot say that the order of the Board setting the conditions for the variance is arbitrary, unreasonable or capricious. Accordingly, the variance order must be affirmed as to the conditions imposed.

Petitioner's second argument is that the Board erred by including in the variance order a provision requiring a certification of acceptance of the variance. Petitioner's position in this appeal is that it sought and still seeks a variance different from that granted by the Board and thus has not accepted the variance permitted.

Respondents, citing *Citizens Utilities Co. v. Pollution Control Board,* 9 Ill. App. 3d 158, 164, 289 N.E.2d 642, 647, answer that the Board is required to condition the finality of its variance order upon execution of a certification of acceptance. The portion of that case referred to states:

"Consistent with section 36 [of the Environmental Protection Act], any such order rendered at the conclusion of a variance hearing allowing the petition could only impose conditions on the grant of the variance, which would not be binding until the petitioner accepts the variance upon the terms imposed."

■■■ We find no statutory authority for respondents' position and are of the opinion that the Citizens Utilities case in fact stands for the proposition that the Board's order in a variance case is a final and appealable order. We believe the language in *Citizens Utilities* referred to by respondents applies to the situation in which a petition for a variance is granted upon the terms requested. In that instance the variance is not binding until the petitioner accepts the variance upon the terms imposed. We have concluded that the language quoted above does not apply to the instant case and that the following language from *Citizens Utilities Co. v. Pollution Control Board*, 9 Ill. App. 3d 158, 163, 289 N.E.2d 642, 646, is more appropriate:

"Variance proceedings are governed by Title IX of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, pars. 1035—1038.) Section 36(a) provides that in granting a variance the Board may impose 'such conditions as the policies of the Act may require * * *.' We believe that the plain meaning of this language is that conditions only attach to the grant of the variance. Thus if a petitioner considers the conditions too onerous and therefore decides not to proceed with the variance, the conditions may not be enforced."

For us to require that the finality and appealability of the instant variance orders depends upon petitioner's acceptance of them would in effect preclude petitioner from seeking review of the orders. Such a position would not only be illogical but also be inconsistent with what we believe to be the intent of the variance provisions of the Environmental Protection Act. Petitioner cannot be forced into the position that in order to perfect an appellate review of the Board's order, it must sign an agreement that would defeat its case upon review. We accordingly reverse that portion of the order which requires petitioner's acceptance and agreement to be bound by the conditions it imposes.

Affirmed in part and reversed in part.

CARTER, P. J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

I cannot agree with the majority's conclusion that the Board erred in including in the variance order a provision requiring a certification of

acceptance of the variance. The requirement is part of the Board's established procedure governing variance proceedings and thus represents an exercise of its rule-making authority under the Environmental Protection Act. This court is without the power to invalidate the Board's requirement of a certification of acceptance unless the rule is found to be clearly arbitrary, unreasonable or capricious. (*Monsanto v. Pollution Control Board,* 67 Ill. 2d 276; *Illinois Coal Operators Association v. Pollution Control Board,* 59 Ill. 2d 305, 319 N.E.2d 782.) The majority apparently believes that the requirement is an abuse of discretion because it places a variance petitioner in the untenable position of having to sign an agreement in order to perfect an appellate review of the Board's order that would, in effect, defeat the petitioner's case on review. This conclusion is grounded on the proposition that the Board's grant of a variance on the conditions requested or a grant modified by new conditions is not a final and appealable order unless the petitioner accept the variance by signing the certification of acceptance. If the majority is correct, by what authority do we review this case since petitioner has not signed the certificate in question?

The provisions of the Environmental Protection Act concerning judicial review of Pollution Control Board orders and decisions specifically require such review to be consistent with the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1041; See *Lake County Contractors Association v. Pollution Control Board,* 54 Ill. 2d 16, 294 N.E.2d 259.) Section 1 of the Administrative Review Act provides in pertinent part that an administrative decision is "* * * any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and which terminates the proceedings before the administrative agency." (Ill. Rev. Stat. 1975, ch. 110, par. 264.) A Pollution Control Board order granting a variance on the terms requested or granting a variance with certain conditions establishes the rights and liabilities of the petitioner under the Environmental Protection Act and terminates the variance proceedings on the merits of petitioner's application. As a consummation of the administrative process, such an order exhausts the jurisdiction of the Board and is final and appealable. This conclusion is mandated by the express language of section 1 of the Administrative Review Act which provides that an administrative decision is final unless an agency rule permits an application for rehearing to be filed and such an application is actually filed. Ill. Rev. Stat. 1975, ch. 110, par. 264.

The Board's requirement of a certification of acceptance on a grant of a variance is not a precondition to appellate review, but rather a sound administrative practice designed to insure the maintenance of an effective program of compliance with the Board's minimum environmental quality

standards. The supreme court has recently noted that "[c]ompliance by all polluters with Board regulations is an ultimate goal," but that "[t]he variance provisions afford some flexibility in regulating the speed of compliance." (*Monsanto v. Pollution Control Board*, 67 Ill. 2d 276, 287.) The variance provisions of the Environmental Protection Act constitute a legislative program of special individual compliance designed to avoid undue hardship and at the same time insure long-term compliance with the Act. I agree with the Second District Appellate Court that a variance is not "binding until the petitioner accepts the variance upon the terms imposed" and that a petitioner may decide not to proceed with the variance granted by the Board if, for example, petitioner considers the conditions imposed to be an undue burden on its operations. (*Citizens Utility Company v. Pollution Control Board*, 9 Ill. App. 3d 158, 163-64, 289 N.E.2d 642.) In the event a petitioner declines to operate under the terms of a variance he is in effect refusing to accept the grant of a variance and is therefore subject to enforcement proceedings for noncompliance with the Board's general environmental quality standards. The Board's requirement for a certified acceptance of a variance grant protects both the public and the individual polluter. If variances were not expressly accepted by individual petitioners, substantial doubt would exist as to whether the Board's variance could be enforced under section 42 of the Act. (Ill. Rev. Stat. 1975, ch. 111½, par. 1042.) As a result, the efficacy of the individual compliance program contemplated by the variance scheme of the Act would be threatened and the individual petitioner would not know whether to comply with the terms of the variance or the Board's general environmental quality standards.

The Board's requirement of an express acceptance of its variance grant, therefore, is consistent with the Environmental Protection Act's objectives and necessary to effectuate the General Assembly's intent "* * * to establish a unified, state-wide program * * * to restore, protect and enhance the quality of the environment." (Ill. Rev. Stat. 1975, ch. 111½, par. 1002(b).) If at the conclusion of a variance proceeding a petitioner wishes to challenge the Board's grant of a variance, the petitioner may refuse to accept the variance and may seek review of the Board's order pursuant to section 42 of the Act. (Ill. Rev. Stat. 1975, ch. 111½, par. 1042.) A successful petitioner wishing to proceed with the Board's grant of a variance must formally accept the variance and will be obligated to comply with the conditions therein. If, however, a petitioner refuses to accept the variance and declines to appeal the Board's order under section 42 or fails to comply with the requirements of that section, the petitioner will be held to the Board's general environmental quality standards. This interpretation of the Board's variance acceptance rule is mandated by the broad objectives of the Environmental Protection Act

and by our duty as a reviewing court to uphold reasonable exercises of discretion by the Pollution Control Board.